IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KARRIE A. HARBIN, ) | |
| ) | |
| Plaintiff, ) | Case No. 11 C 3037 |
| ) | |
| v. ) | |
| ) | Judge Joan H. Lefkow |
| CAROLYN W. COLVIN,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Karrie Ann Harbin brings this action under 42 U.S.C. § 405(g) for review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits and supplemental security income (collectively "benefits") under the Social Security Act ("the Act"), 42 U.S.C. §§ 423(d) and 1381a. The parties have filed cross-motions for summary judgment. For the following reasons, the court grants Harbin's motion (dkt. 16), denies the Commissioner's motion (dkt. 24), and remands this case for further proceedings consistent with this opinion.[2]

## BACKGROUND

**I.     Harbin's Employment History**

Harbin was born on September 11, 1972 and is now 42 years old. (Administrative Record ("AR") 13.) She has one teenage child. (*Id.*) In 2004, Harbin earned an associate's degree in management from the Milwaukee Area Technical College. (AR 13-14.)

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin was automatically substituted for the former Commissioner, Michael J. Astrue, as the defendant when she became the Acting Commissioner of Social Security on February 14, 2013. Fed. R. Civ. P. 25(d).

[2] This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

From 2005 to 2007, Harbin was employed as the manager of a Qdoba Mexican Grill. (AR 15-16.) At Qdoba, she supervised a staff of about ten people and "pretty much did everything," including opening and closing the restaurant, computer work, cash control, substituting for sick employees, customer service, and inventory management. (AR 16.) Before working at Qdoba, Harbin worked in a variety of positions, including as a dental assistant, where she was responsible for cleaning exam rooms, keeping patient charts, and answering telephones. (AR 17, 171.)

In March 2007, Harbin married Michael Harbin and relocated from Wisconsin to Chicago. (AR 15-16.) She planned to take six months off from work to acclimate herself and her daughter to the new city. (AR 26.) But in the fall of 2007, Harbin began experiencing pain. In May 2008, Harbin attempted to return to work as a part-time sales associate at the clothing store, Lane Bryant.[3] (AR 138.) Her responsibilities required her to be on her feet for four to five hours per shift and lift up to 15 pounds. (AR 14.) Harbin testified that after her shifts, she would be in so much pain that her husband would have to help her from her car to her house. (AR 14-15.) She often called in sick because of her pain. (AR 15.) She stopped working at Lane Bryant in August 2008 because the physical requirements were too demanding. (AR 14, 138.)

## II. Harbin's Medical History

Harbin started feeling "terribly" in the fall of 2007. (AR 26.) She had pain in her back and legs and suffered from fatigue. (AR 25.) Her primary care physician, Dr. Ingrid Liu, referred her to Dr. Douglas Cotsamire, a rheumatologist, in April 2008. (AR 237-38.) Although Dr. Cotsamire found that Harbin suffered from pain in her neck, shoulders, back and hips, he noted that her joints moved normally and that "[n]o pathology is evident." (*Id.*) There was no

---

[3] In her testimony before the ALJ, Harbin stated she worked about 20 hours per week at Lane Bryant. (AR 14).

evidence of inflammation in her joints. (*Id.*) Dr. Cotsamire diagnosed Harbin with diffuse myofascial pain disorder,[4] non-restorative sleep, and fatigue. (*Id.*) He ordered some additional tests and prescribed Doxepin, a medication used to treat depression, anxiety, and insomnia. (*Id.*) Dr. Cotsamire also noted that Harbin was 5 feet 5 inches and 278 pounds and suggested that Harbin build up an exercise program. (*Id.*)

Harbin visited Dr. Cotsamire again on April 24, 2008. (AR 235-36.) Although her sleep had improved, there was no change in her pain. (*Id.*) Dr. Cotsamire increased the dosage of Doxepin. (*Id.*) Harbin next returned to Dr. Cotsamire on September 4, 2008. (AR 225-27.) She informed him that she had worked in retail from May to August but quit because of her pain. (*Id.*) She also told him it was hard to sit for a long period of time. (*Id.*) Dr. Cotsamire noted that Harbin was "sometimes tearful" during the visit. (*Id.*) He instructed Harbin to take the Doxepin every night and also prescribed Cymbalta, another antidepressant. (*Id.*) Additionally, he referred her to a physical therapist to help her start a "desperately need[ed]" exercise program.[5] (*Id.*)

About a week later, Harbin visited Dr. Michael McNett, a fibromyalgia specialist. (AR 244-53.) Dr. McNett found that Harbin was in moderate distress and exhibited 15 of 18 tender

---

[4] The relationship between chronic myofascial pain ("CMP") and fibromyalgia syndrome ("FMS") is complicated and not completely understood. "CMP may resemble [FMS] and has sometimes been referred to as 'regional fibromyalgia.' Both disorders are defined as having 'tender points in muscles.' However, CMP is believed to be a disorder of the muscle itself while FMS is believed to be a disorder in the way the brain processes pain signals. FMS is usually associated with more widespread pain and other symptoms that do not affect muscles including sleep disruption, irritable bowel syndrome, fatigue throughout the body, and headache." Cleveland Clinic, Chronic Myofascial Pain, http://my.clevelandclinic.org/disorders/chronic_myofascial_pain/hic_chronic_myofascial_pain_cmp.aspx (last visited October 2, 2014). It is believed CMP may lead to FMS in some people. *See* MayoClinic, Myofascial Pain Syndrome, http://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/basics/complications/con-20033195 (last visited October 2, 2014).

[5] The record does not contain records from a physical therapist.

points.[6] (AR 245.) He diagnosed Harbin with fibromyalgia, restless leg syndrome, candida, and depression. (AR 246.) He also prescribed Cymbalta but this was later changed to Neurontin, a medication used to treat neuropathic pain, restless leg syndrome, insomnia, and anxiety, because Cymbalta made Harbin ill. (AR 246, 252.) Harbin visited Dr. McNett's office again in November 2008 and was found to have 11 of 18 tender points. (AR 270-73.)

Dr. McNett retired toward the end of 2008 and Harbin was referred to Dr. Rochella Ostrowski, a rheumatologist. (AR 276-79.) Dr. Ostrowski reported that Harbin stopped taking Neurontin, which had helped with her insomnia, because of weight gain. (AR 276.) She found four pairs of tender points but no loss of strength in Harbin's extremities. (AR 277.) Dr. Ostrowski confirmed Harbin's fibromyalgia diagnosis and discussed factors that contribute to fibromyalgia, including lack of restorative sleep and depression. (*Id.*) Dr. Ostrowski told Harbin that treating these factors is a mainstay of the treatment of fibromyalgia and noted that "[a] regular gentle exercise routine has also been found to be very helpful in cases of fibromyalgia[.]" (*Id.*) Dr. Ostrowski prescribed Amitriptyline. (*Id.*)

Harbin also visited a chiropractor, Dr. Michael Heatwole, during 2008 and 2009 to relieve her pain. (AR 256-60, 307-27.) On May 5, 2008, Dr. Heatwole observed that Harbin had "good days and bad days but does have general pain most of the time." (AR 257.) He performed some gentle adjustments and suggested that Harbin exercise regularly. (*Id.*) Dr. Heatwole's notes generally indicate that Harbin was in consistent pain during the time she was treated, but she sometimes had flare-ups during which the pain increased. (AR 256-60, 307-27.)

---

[6] Fibromyalgia is often diagnosed using tender points, which are "pain points or localized areas of tenderness around joints, but not the joints themselves." WebMD, Fibromyalgia Tender Points, http://www.webmd.com/fibromyalgia/guide/fibromyalgia-tender-points-trigger-points (last visited October 2, 2014). Fibromyalgia may be diagnosed in a claimant with: (1) a history of widespread pain, (2) at least 11 positive tender points (of 18), and (3) no other disorders that could cause the symptoms. *See* Social Security Ruling 12-2p, 77 Fed. Reg. 43,640, 43,641-42 (July 25, 2012).

4

In addition to fibromyalgia, Harbin also suffers from heart arrhythmia (AR 17, 223), hypertension (AR 291), and a fatty liver (AR 229).  She has a history of edema in her hands and feet, and she is obese.  (AR 19, 237, 276.)  At various points throughout the medical records, Harbin also complains of depression.  (*See, e.g.,* AR 223, 245, 251; *see also* AR 246 (notes of Dr. McNett diagnosing Harbin with depression).)

At the time of the hearing in front of the Administrative Law Judge ("ALJ"), Harbin was taking a medley of medications to cope with her medical issues, including Robaxin to assist with sleep, Triamterene for water retention, Loratadine for allergies, and Enalapril Maleate for heart arrhythmia.  (AR 18.)  Harbin also testified she regularly takes vitamins including Omega-3.  (*Id.*)  Robaxin, a prescription muscle relaxer prescribed to assist with sleep, makes Harbin very tired and she can only take it at night.  (*Id.*)  She does not complain of any other side effects from her medications.  (*Id.*)

## IV.  Harbin's Benefits Claim

Harbin filed her claim for disability benefits on September 25, 2008.  (AR 119-20.)  She initially claimed that her disability began on February 2, 2007 (before her move to Chicago), but she later amended the onset date to September 21, 2007.  (*Compare* AR 119, *with* AR 145.)

A reviewing physician, Dr. Bharati Jhaveri reviewed Harbin's claim and concluded that Harbin's treatment generally was successful in managing her symptoms.  (AR 268.)  She stated that the "description of the severity of [Harbin's] pain is extreme and unsupported by the medical and other evidence in the record," and concluded that Harbin's complaints were only "partially credible."  (*Id.*)  The Social Security Administration ("SSA") denied Harbin's claim on November 6, 2008, stating that her condition did not prevent her from doing the work she had previously done as a dental assistant.  (AR 60-65.)

Harbin requested reconsideration. (AR 66.) On March 18, 2009, another reviewing physician Dr. Virgilio Pilapi recommended affirming the denial of Harbin's claim. (AR 283-85.) He noted that although Harbin complained of generalized pain, headaches, and fatigue, she had "full range of motion at the shoulders, elbows, wrists, hands, hips, knees and ankles," no swollen or tender joints, and her motor strength was "5/5 throughout." (AR 285.) Dr. Pilapi agreed with Dr. Jhaveri that Harbin could perform a full range of light work. (*Id.*) The SSA thus denied her reconsideration request on March 27, 2009. (AR 68-71.) In affirming its initial decision, the SSA again cited Harbin's prior work as a dental assistant as an example of work she remained capable of doing. (AR 71.)

Harbin requested a hearing. (AR 74.) She appeared before ALJ John L. Mondi on October 15, 2009. (AR 9-47.) She testified that she suffered from severe muscle pain, stiffness, headaches, flu-like symptoms, and an inability to sleep. (AR 14-15, 18, 25, 27-30.) She testified that she could sit for about 15 to 20 minutes before standing, could stand for 10 to 15 minutes, could lift up to 20 pounds, and could walk one to two blocks. (AR 19, 31-32.) She testified that she is unable to take care of her home or herself as she had in the past and that she requires assistance to get dressed in the mornings, struggles to take showers due to pain, and has trouble shopping without the help of her husband or daughter. (AR 21.) She testified that she is able to fold laundry but unable to carry it up the stairs, only cooks about once a week, and attends church twice a week. (AR 22.) When asked whether there were any conditions besides her fibromyalgia that prevented her from working, she said there were not. (AR 17.)[7]

The ALJ denied Harbin's claim on December 21, 2009 (AR 53) and the Appeals Council denied Harbin's request for review on February 14, 2011 (AR 5), making the ALJ's findings the

---

[7] Harbin's husband also testified in front of the ALJ, corroborating Harbin's complaints.

final decision of the Commissioner pursuant to 20 C.F.R. § 405.372. Harbin timely filed this lawsuit on May 6, 2011.[8]

## LEGAL STANDARD

A court should uphold the final decision of the Commissioner "if the ALJ applied the correct legal standards and supported her decision with substantial evidence." *Bates* v. *Colvin*, 736 F.3d 1093, 1097-98 (7th Cir. 2013) (citing 42 U.S.C. §405(g); *Jelinek* v. *Astrue*, 662 F.3d 805, 811 (7th Cir. 2011)).[9] "Substantial evidence" has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson* v. *Perales,* 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting *Consolidated Edison Co.* v. *NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). A court may not "reweigh the evidence or substitute [its] own judgment for that of the ALJ; if reasonable minds can differ over whether the applicant is disabled, [it] must uphold the decision under review." *Shideler* v. *Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). The ALJ's decision, however, must rest on "adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger* v. *Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Shideler*, 688 F.3d at 310 (quoting *Schmidt* v. *Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)). "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner* v. *Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele* v. *Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)).

---

[8] The Appeals Council granted Harbin's request for an extension of time to file suit. (AR 2.)

[9] The Act provides, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g).

## ANALYSIS

**I.     Legal Framework**

A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1). To determine whether a claimant is disabled and thus eligible for disability insurance benefits, an ALJ uses a sequential five-step inquiry. *See* 20 C.F.R. §§ 404.1520, 416.920; *Kastner*, 697 F.3d at 646. At step one, the ALJ determines whether the claimant is engaged in substantial gainful activity. *See* 20 C.F.R. §§ 404.1520, 416.920. If so, the claimant is not eligible for benefits. *See id.* At step two, the ALJ assesses whether the claimant has an impairment or combination of impairments that are severe. *See id.* At step three, the ALJ determines whether the impairments meet or equal a listed impairment in the Social Security regulations and thus preclude substantial gainful activity. *See id.*; 20 C.F.R. pt. 404, subpt. P, app. 1. At step four, the ALJ analyzes the claimant's residual functioning capacity ("RFC") to determine whether the claimant can perform her past relevant work. *See* 20 C.F.R. §§ 404.1520, 416.920. Finally, at step five, the ALJ determines whether the claimant can perform other work considering the claimant's RFC, age, education and experience. *See id.* "The process is sequential, and if the ALJ can make a conclusive finding at any step that the claimant either is or is not disabled, then she need not progress to the next step." *Young* v. *Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at step five. *Briscoe ex rel. Taylor* v. *Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

## II. ALJ's Decision

The ALJ first determined that Harbin had not engaged in substantial gainful activity since the alleged onset date of her disability.[10] (AR 50.) At step two, the ALJ found that Harbin had two severe impairments—fibromyalgia and obesity. (*Id*.) At step three, he found that the impairments did not meet or equal a listed impairment contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 50-51.)

Before moving to step four, the ALJ assessed Harbin's RFC and determined that she could perform the full range of light work defined in 20 C.F.R. § 404.1567(b) with no additional limitations. (AR 51.) He found that, although her impairments could reasonably be expected to cause the alleged symptoms, Harbin's statements with respect to the "intensity, persistence and limiting effects of [her] symptoms" were not credible to the extent they did not align with his RFC assessment. (AR 52.) In making his determination, he cited to Dr. Ostrowski's report noting that Harbin had full range of motion, normal strength and no tender joints. (*Id.*) He also discussed Harbin's daily activities and the fact that her doctors had consistently suggested gentle exercise, which is "consistent with a limitation to light work." (*Id.*) He credited the opinions of the reviewing physicians, Dr. Jhaveri and Dr. Pilapi, and observed that none of Harbin's treating physicians ever placed any restrictions on her activities which, "[g]iven the claimant's allegations of totally disabling symptoms, one might expect." (AR 53.) He concluded that he was "not convinced that the claimant's intense episodes of pain have been so frequent or long lasting that they have precluded work at all exertional levels at all times material to this decision." (*Id.*) At step four, the ALJ found that, even with a limitation of light work, Harbin would be able to perform her past relevant work as a dental assistant or sales associate. (*Id.*)

---

[10] Although Harbin had engaged in part-time work since the onset date of her limiting conditions, the ALJ found that that work did not rise to the level of substantial gainful activity. (AR 50.)

9

**III.    Deficiencies in the ALJ Decision**

Although Harbin makes several arguments in support of her motion for summary judgment, they all relate to whether the ALJ gave proper weight to Harbin's testimony about the limitations that resulted from her impairments.  "The ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying."  *Jones* v. *Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) (citing *Castile* v. *Astrue*, 617 F.3d 923, 928-29 (7th Cir. 2010)).  When assessing an ALJ's credibility determination, the court need not undertake a *de novo* review of the medical evidence presented to the ALJ.  It must only "examine whether the ALJ's determination was reasoned and supported," and only if it "lacks any explanation or support" is the determination found to be patently wrong and deserving of reversal.  *Elder* v. *Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008) (citing *Jens* v. *Barnhart*, 347 F.3d 209, 213-14 (7th Cir. 2003); *Powers* v. *Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).  When an ALJ's credibility determination "rests on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision."  *Clifford* v. *Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (quoting *Herron* v. *Shalala*, 19 F.3d 329, 335 (7th Cir. 1994)) (alteration in original, internal quotation marks omitted).

Reading the ALJ's opinion generously, he provided the following objective reasons for discounting Harbin's credibility:  (1) her statements were not supported by objective medical evidence; (2) her statements were not supported by her daily activities; (3) her doctors advised her to exercise; and (4) the reviewing physicians found she was capable of light work, a finding which was not rebutted by her treating physicians or the medical records.  The court finds these reasons, as presented by the ALJ in his opinion, are insufficient to support his adverse credibility

determination. *See Clifford*, 227 F.3d at 872 ("While the ALJ is not required to address every piece of evidence, he must articulate some legitimate reason for his decision.").

Regarding the first reason, the ALJ cites to only one medical record in his credibility finding, which relates to the one visit that Harbin made to Dr. Ostrowski on December 31, 2008. (AR 52.) He observes that Harbin weighed 303 pounds at the time of the visit, had full range of motion in her joints, no synovitis, a normal neurologic exam, full muscle strength in her extremities, and no tender joints. (*Id.*) He notes that Dr. Ostrowski found four pairs of tender points. (*Id.*) The ALJ does not discuss the multiple other visits that Harbin made to Dr. Liu, Dr. Cotsamire, and Dr. McNett seeking relief from her pain and fatigue. He also does not reference the fact that Harbin was diagnosed with additional tender points by her other physicians.[11] (*See, e.g.,* AR 245, 271.) Fibromyalgia is diagnosed primarily based on a patient's subjective complaints and the absence of other causes for the complaints. *See Aidinovski* v. *Apfel*, 27 F. Supp. 2d 1097, 1102 (N.D. Ill. 1998) (citing *Sarchet* v. *Chater*, 78 F.3d 305, 306 (7th Cir. 1996)). Thus the fact that Dr. Ostrowski did not observe any physical causes for Harbin's pain is unsurprising given the ALJ's finding that Harbin did indeed suffer from fibromyalgia. *Aidinovski*, 27 F. Supp. 2d at 1103 ("By definition [a claimant's] fibromyalgia diagnosis means that in all likelihood her accounts of pain and fatigue will seem out of proportion with the available objective evidence."). The ALJ's selective reference to one of Harbin's medical records is not sufficient to support his adverse credibility finding with respect to Harbin's alleged limitations.[12] *See Rios* v. *Colvin*, No. 12 C 6470, 2014 WL 4815083, at *7 (N.D. Ill. Sept. 29,

---

[11] At step two, the ALJ did reference Dr. McNett's observation of 15/18 tender points. (AR 50.)

[12] The ALJ's examination of Harbin's medical records is minimal and can be easily distinguished from that of the ALJ in *Castile*, where the testimony of a claimant suffering from fibromyalgia was also discounted by the ALJ. *See Castile*, 617 F.3d at 929-30 (detailing ALJ's thorough review of the medical records and findings in making his credibility determination); *see also Villano* v. *Astrue*, 556 F.3d 558,

11

2014) (remanding for revised credibility finding where ALJ did not consider medical evidence supporting claimant's testimony).

Second, the ALJ pointed out that Harbin testified that she could get her daughter ready for school, do light housework, help her daughter with homework, occasionally cook, fold laundry, drive, read, talk on the phone, and go to church. (AR 52.) He also noted that Harbin testified that she could lift 20 pounds and walk half a mile "on a good day." (*Id.*) Although the ALJ found these activities to be consistent with light work (AR 52), "[a] claimant's ability to perform limited and sporadic tasks does not mean she is capable of full-time employment." *Goble* v. *Astrue*, 385 F. App'x 588, 592 (7th Cir. 2010) (citations omitted); *see also Clifford*, 227 F.3d at 872 ("[M]inimal daily activities, such as those in issue, do not establish that a person is capable of engaging in substantial physical activity."); Social Security Ruling 96-8p, 61 Fed. Reg. 34,474, 34,475 (July 2, 1996) (residual functional capacity is an assessment of an individual's ability to perform sustained work-related physical activities in a work setting for eight hours a day, five days a week, or the equivalent schedule).

Third, the ALJ observed that Harbin's physicians all suggested that she exercise and reasoned that this suggestion is consistent with light work. (AR 52.) But the ALJ failed to explore the extent of the physicians' suggested exercise regimens at the hearing, and there is simply inadequate evidence that the exercise would have been comparable to a full-time, light-work position. *Cf. Carradine* v. *Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004) ("The weight the administrative law judge gave to [the claimant's] ability to walk two miles was perverse: not only is it a form of therapy, but it is not a form of therapy available at work."). Further, the fact that Harbin was not successful in losing weight is not reason to deny her benefits claim. *See*

---

563 (7th Cir. 2009) ("The ALJ's cursory analysis does not give us confidence that he had appropriate reasons for rejecting the limitations [the claimant] alleged.").

Social Security Ruling 02-1p, 67 Fed. Reg. 57,859, 57,864 (Sept. 12, 2002) ("We will rarely use 'failure to follow prescribed treatment' for obesity to deny or cease benefits . . . . A treating source's statement that an individual 'should' lose weight or has 'been advised' to get more exercise is not prescribed treatment.")

Finally, the ALJ gave "some weight" to the reports of Dr. Jhaveri and Dr. Pilapi, who reviewed Harbin's medical records and concluded that she could perform a full range of light work. (AR 53.) But these reports relied on the objective observations by Harbin's treating physicians that, as discussed above, often do not provide a cause for a fibromyalgia patient's debilitating pain. The ALJ also noted that the record did not contain a contradictory opinion from a treating source and, in its absence, he opined, "Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor." (*Id.*) The record is not clear why Harbin did not supply an opinion from a treating source (at least one of Harbin's physicians had recently retired and may not have been available for an opinion).[13] But even without such an opinion, the ALJ's suggestion that physicians treating patients for fibromyalgia would put limitations on those patients evidences a fundamental misunderstanding of the disease. Because the disease has no objective cause, it is unlikely that a doctor would suggest restrictions beyond what is necessary for the patient to control her pain.[14]

---

[13] The Commissioner argues that a treating source's notes should be given little weight if the source fails to venture an opinion as to a claimant's residual capabilities, citing *Books* v. *Chater*, 91 F.3d 972, 978 (7th Cir. 1996). But without evidence from any other examining source, the ALJ had little basis on which to discredit Harbin's treating sources. Perhaps on remand the Commissioner will be able to obtain opinions from treating and/or examining sources about Harbin's capabilities.

[14] The Commissioner's citation to *Maher* v. *Secretary of Health & Human Services*, 898 F.2d 1106, 1109 (6th Cir. 1989), is unconvincing. Maher suffered from a "progressive neuropathic syndrome characterized by foot and leg deformities, weakness and atrophy" and had to undergo multiple corrective surgeries. *Id.* at 1108. The court found that Maher's doctor's advice to avoid only strenuous sports

While the court will not decide that Harbin is in fact entitled to benefits, as in *Aidinovski*, the court finds that absent proper consideration of the subjective nature of the fibromyalgia symptoms, the ALJ did not adequately support his credibility determination and did not properly assess Harbin's functional limitations. *Aidinovski*, 27 F. Supp. 2d at 1103. In addition to the issues detailed above, the ALJ failed to discuss implications of Harbin's obesity, *see Barrett* v. *Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004), and did not reference Harbin's complaints of depression, which has been linked to both obesity and fibromyalgia. *See* Social Security Ruling 02-1p, 67 Fed. Reg. 57,859, 57,861 (Sept. 12, 2002) ("Obesity may also cause or contribute to mental impairments such as depression."); Social Security Ruling 12-2p, 77 Fed. Reg. 43,640, 43,643 (July 25, 2012) (noting that depression is connected to fibromyalgia). The ALJ also did not discuss how Harbin's fatigue would affect her ability to perform at a full time job.[15]

In all, the ALJ did not provide sufficient reasons from which the court can discern support for his finding that Harbin is not credible, and thus the court must remand to the Commissioner for proceedings consistent with this opinion.

## IV. Commissioner's Arguments for Summary Judgment

Most of the Commissioner's arguments for summary judgment are addressed above, but there is one remaining argument that must be addressed. The Commissioner cites the fact that Harbin worked as a sales associate at Lane Bryant for three months as "[p]erhaps the strongest point in favor of the ALJ's decision." (Dkt. 25 at 4.) But although the ALJ mentions Harbin's

---

"constitutes substantial evidence for a finding of non-disability." *Id.* at 1109. This is easily distinguished from Harbin's case, where it is not clear what activities would aggravate her condition.

[15] Harbin also asserts that the ALJ failed to consider that she suffered from edema in her hands and feet and the side effects of her medication. The court finds the ALJ did not err on these fronts. With respect to the edema, it is clear from the record that Harbin suffered from the condition long before she stopped working. (AR 19.) Also, the only medication side effect that Harbin complained of at the hearing was grogginess when she took Robaxin, a sleep aid. (AR 18.) This would not limit Harbin's ability to work.

employment at Lane Bryant, there is no indication that it factored into his decision to deny benefits. (*See generally* AR 51-53.)  A court may not affirm an ALJ's decision "based on post-hoc justifications provided by the Commissioner's lawyers." *Hunt* v. *Astrue*, 889 F. Supp. 2d 1129, 1133 (E.D. Wisc. 2012) (citing *Spiva* v. *Astrue*, 628 F.3d 346, 348 (7th Cir. 2010)).  And even if the ALJ had pointed to this brief employment, it would have been insufficient to support the ALJ's denial of Harbin's claim.  Indeed, Harbin's employment at Lane Bryant was classified as an "unsuccessful work attempt" by the SSA.  (AR 144.)  *See McKinzey* v. *Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) (unsuccessful work attempts "just as easily provide corroboration that [claimant's] impairments significantly limited her ability to work, as opposed to evidence that her ability was greater than she alleged").

## CONCLUSION

For the foregoing reasons, the court grants Harbin's motion for summary judgment insofar as it requests a remand and denies the Commissioner's motion for summary judgment. The court remands the case to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

Date:  October 6, 2014                             _____
                                                   U.S. District Judge Joan H. Lefkow